## SUPREME COURT.

THE PEOPLE *ex rel.* MARK M. POMEROY agt. ANDREW H. GREEN and others constituting THE BOARD OF APPORTIONMENT AND AUDIT.

Where the *relator's newspaper* was designated and selected by the mayor and comptroller ef the city of New-York, in 1868, under the laws of 1868, as one of the journals wherein the proceedings of the common council and the notices of its committees should be published; and, in 1870, other newspapers, of which the relator's was not one, were designated by the same officers under the act of that year, and it was declared by that act to be unlawful to pay any money for advertising thereafter made for or on account of the corporation, except to such newspapers (*Laws*, 1870, *ch* 383); and no designations were made under this act, and the power thereby conferred remained unexecuted.

*Held,* that a *mandamus* would lie to compel the defendants to audit and allow the bills of the relator for advertising done in 1870, after the passage of chapter 383 of the laws of that year, and solely under the authority of the designation of his newspaper in December, 1868, there never having been any notice, either express or implied of the revocation of the original appointment of his newspaper.

*Special Term, June,* 1872.

THIS was a motion for a writ of peremptory mandamus to compel the board of apportionment and audit to convene and proceed to audit and allow the bills of the relator for advertising and publishing notices, &c., for the corporation of the city of New-York in certain newspapers, known as *The New-York Democrat* and *Pomeroy's Democrat.* The bills of relator were duly presented for payment to the board, but the board neglected to audit and allow the same.

GEORGE NORRIS and ABRAHAM LAWRENCE, *of counsel for relator.*

JOHN H. STRAHAN and EDWARDS PIERREPONT, *of counsel for the board of apportionment and audit.*

RICHARD O'GORMAN, *for the mayor, aldermen, and commonalty of the city of New-York.*

BARRETT, *J.*—The question presented for the consideration of the court is whether the relator has any legal claim against the city and county of New-York, which it is the duty of the board of audit to investigate and settle. The solution of this question depends upon the construction given to the second section of chapter 375 of the laws of 1872. The comptroller is thereby required to allow and pay the bills of the *several proprietors of the newspapers in said city and county for all city and county advertising actually done prior to January* 1, 1872.

It is claimed that the effect of the words italized is to legalize all previously illegal demands, and to require the payment of the bills of mere volunteers, the same as of those publishing under legal authority. It would require the most direct and unmistakable language, language susceptible of no other or fairer meaning, to justify the court in imputing a legislative intention to perpetrate such wrong upon our people. There is nothing in the act demanding such an interpretation. Its object, so far as the newspapers are concerned, evidently was to provide an appropriate procedure, with an adequate fund for the speedy liquidation and payment of all strictly legal obligations, and also of all just and honest claims of an equitable, if not of a technically legal, character. There is the fullest intention of providing for publishers who had acted under legal authority, or, at least, in good faith under color of such authority, but none of presenting any part of the public funds to those who had acted in palpable violation of law without a shadow of authority. There are other provisions of the act favoring this construction, such as the distinct reference to the authority of the board of canvassers in connection with the publication of the official canvass, and also the direction not to " audit or allow any claim at a greater rate or amount than that *fixed by law or by a contract*

under which any services were rendered or materials furnished."

So, too, as to the mode of procedure. The bills are to be read aloud at the time of presentation, entered by the clerk of the board in a suitable book or journal, and laid on the table for four days thereafter for objections.

"All objections" made within the four days are to be duly considered by the board. The words "all objections" are surely broad enough to cover the major as well as the minor, the legality as well as extent of claim. It is also urged that the general laws of the state in force at the time of the passage of the act, afforded adequate remedies for the enforcement of all legal claims, and that, therefore, the provisions in question are supererogatory under any other than the extreme construction contended for. This view, however, overlooks the fact that even for those whose claims are of undoubted validity, a special fund is provided with a procedure which contemplates payment within thirty days from the passage of the act. It also overlooks the equitable spirit which pervades the act, and which authorizes the board to consider the claims of those who with but doubtful legal right are yet entitled, having acted in good faith, under cover of legal authority and equitable consideration. Take, for instance, the provision respecting the publication of the official canvasses. Here all publications actually made under the authority of the board of canvassers are legalized and payment required.

Whether the board of canvassers directed such publications without any legal authority, or, having a limited authority, exceeded their powers with reference to the number of the newspapers or the extent of such publication. The innocent proprietor who published *bona fide*, relying on such authority, is protected. It will be seen that the act in question was a necessary and just supplement to existing laws, and that the construction which the court puts upon it, is in

harmony with its purpose and spirit. It remains but to apply these views to the case of the relator.

A large part of the publication for which he claims, viz., those specified in schedules C, D, E, and F annexed to his affidavit, were made apparently without any contract, express or implied, and without any legal authority or even official request. The allowance of such claims would be pure gratuity, and the court will not by *mandamus*, a writ which only issues in cases of unquestionable legal right, direct the board even to consider them.

A part of the relator's services, however, (viz.: those specified in schedules A and B appended to his affidavit), was performed under color of legal authority. On the 1st of December, 1868, his newspaper, the *Daily Democrat*, was selected by the mayor and comptroller, under chapter 853 of the laws of that year, as one of the journals wherein the proceedings of the common council and the notices of its committees should be published. In 1869, there was no legislation on the subject. In 1870, the mayor and comptroller were authorized to designate seven daily and six weekly newspapers for such advertising purposes, and it was declared to be unlawful to pay any money for advertising thereafter made or incurred, of any description, for or on account of the corporation, except to such newspapers (*laws of* 1870, *chapter* 383). No designations were made under this act, and the power thereby conferred remained unexecuted. In 1871, the mayor and comptroller were authorized to designate, from time to time, nine morning or evening daily, and nine weekly newspapers, to publish such digest of the proceedings of the common council as might be prepared and authorized by this act.

All the newspapers authorized by this act were duly designated, but none of the relator's journals were selected. The advertising specified in schedules A and B was done in 1870 after the passage of chapter 383 of the laws of that year, and solely under the authority of the designation of

December 1, 1868. If the work had been done at the designation of the nine daily and nine weekly newspapers under the act of 1871, it would have been plainly illegal, and the court could not have treated it as within even the broad language and equitable spirit of the act of 1872. But it was all done in 1870 without any notice, express or implied, of the revocation of the original appointment, and it may well be in view of the failure to designate afresh the absence of any revocation or other notice, and the necessity which existed for some corporation advertising that the proprietors of the four daily and three weekly newspapers, which had been designated under the act of 1868, thus deemed their appointments to have been continued under the act of 1870. At all events, that part of the work was beneficial and necessary so long as the power remained unexecuted and was done under color of legal authority, and if the above view is correct, it comes within the purview of the act of 1872, and is thereby directed to be audited, allowed and paid.

A mandamus must, therefore, issue requiring the board to audit the claims embraced in said schedules A and B. It will then be for the board to investigate the details, and satisfy itself that the advertisements were actually inserted and published as charged, and to audit such items as in this view of their legality may be found to be just, but at no greater rate or amount than fixed by law or by a contract under which such services were rendered. And if there be no express contract, then the board should audit upon the basis of the *quantum meruit*, viz., of an implied contract to pay what the services are reasonably worth. This is a matter within the discretion of the board, and the mandamus will only direct the principle upon which it should act, without interfering with the fullest exercise of this discretion. In all other respects the motion is denied. Let the order be settled upon one day's notice.